## UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA
## SOUTHWESTERN DIVISION

---

Case No. _____

**Dr. Jayaram Bharadwaj,**

            Plaintiff,

      v.

**Mid Dakota Clinic, P.C., Dr. Robert Tanous, Dr. Shelly Seifert, Dr. Vijay Rao, Marvin Lein, Dr. Steve Hamar, and Board of Directors, Mid Dakota Clinic, P.C.**

            Defendants.

**COMPLAINT AND
JURY TRIAL DEMAND**

---

## INTRODUCTION

1. Dr. Bharadwaj ("Dr. Jay") practiced as a Physician Oncologist at Mid Dakota Clinic. He devoted himself fully to his work and achieved outstanding outcomes for his patients – he received many letters from them expressing gratitude for his devotion to service. Unfortunately, he also received racial epithets and taunting from staff. After he reported the discriminatory behavior – and likely Medicare fraud by another physician – the Clinic retaliated against him by fabricating pretextual reasons for his suspension and ultimate termination. In doing so, Defendants violated the Civil Rights Act, Americans with Disabilities Act, and the False Claims Act

– they also breached their fiduciary duties to him as a shareholder.  Dr. Jay

brings this action to request the Court's assistance in seeking relief for the

Clinic's unlawful conduct.

## JURISDICTION AND VENUE

2.   Dr. Jay bases his claims, in part, on Title VII of the Civil Rights Act of

1964, the Americans with Disabilities Act, and the False Claims Act.  Thus,

this Court has federal question subject matter jurisdiction pursuant to 28

U.S.C. §§ 1331 and 1343.  This Court also has supplemental subject matter

jurisdiction over Dr. Jay's state law claims pursuant to 28 U.S.C. § 1367.

3.  This Court has personal jurisdiction over Defendants because they reside

and do business in North Dakota, with their principal place of business in

Bismarck.

4.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events giving rise to Dr. Jay's claims occurred in this

judicial district.

5.  The EEOC issued a right to sue letter on April 13, 2016.

## PARTIES

6.  Dr. Jay practiced as a Physician Oncologist at Mid Dakota Clinic ("Clinic").

He was an "employee" of the Clinic as defined by Title VII and the ADA

and for purposes of the False Claims Act.  He also earned shareholder status in 2013.

7. Mid Dakota Clinic is a North Dakota corporation with its principal office in Bismarck.  The Clinic was Dr. Jay's "employer" as defined by Title VII and the ADA and for purposes of the False Claims Act.  The Clinic is not a publicly held corporation.

8. The Clinic's Board of Directors ("Board") manages the property, affairs, and business of the Clinic.  The Board holds the power to suspend physicians from employment and recommend termination to shareholders.

9. Drs. Tanous, Seifert, Rao, and Hamar served as members of the Board and held the following positions: Dr. Tanous – Medical Director; Dr. Seifert – President of the Board; Dr. Rao – Oncology Department Chair and Medical Director – Lab; and Dr. Hamar – Medical Director – Ambulatory Surgical Center.  All operated as agents of the Clinic.  They were also fellow shareholders with Dr. Jay in the Clinic.

10. Marvin Lein acted as the Clinic's CEO – he also operated as an agent for the Clinic and qualifies as an "officer" under N.D.C.C. § 10-19.1.

11. As agents of the Clinic, the Board, Lein, and Drs. Tanous, Seifert, Rao, and Hamar qualify as "employer[s]" of Dr. Jay under Title VII, the ADA, and the False Claims Act.

## FACTS

### *Dr. Jay practiced as a Physician Oncologist at the Clinic.*

12. Dr. Jay was born and raised in India – he belongs to the Indian/Asian race. He completed his medical training there and immigrated to the United States to secure a better future for his children and seek the American Dream.

13. Dr. Jay started practicing as a Physician Oncologist with the Clinic in August 2010.  He began as a *locum tenens* physician on a temporary basis but quickly decided to pursue a permanent position.  Dr. Jay appreciated the warmth and gratitude of his patients – many thanked him for "coming all the way from India to take care of us here in North Dakota."  He found the workflow smooth and the staff courteous.  He also believed that Bismarck was a wonderful place to permanently settle and raise his children.

14. The Clinic offered Dr. Jay full-time employment the next month and he enthusiastically accepted.[1]

### *Dr. Jay endured racial bias from Clinic staff.*

15.  Unfortunately, not all of the Clinic's staff showed kindness – or even basic professional courtesy – to Dr. Jay.  Nurse Tracy Kuch demonstrated racial prejudice against him by repeatedly referring to him as "Ahmed the

---

[1] Upon learning of Dr. Jay's employment offer, Nurse Rosemarie Kuntz said, "This is wonderful news.  I have heard nothing but positive remarks from patients, doctors, and staff."

Terrorist."  She told him, staff members, and even patients that "nobody" could understand him because he "speaks Hindu."[2]  In fact, as Nurse Kuch knew, Dr. Jay speaks English and his patients understood him just fine, despite his Indian accent.[3]  For good measure, she told staff members that the "J" in Dr. Jay stood for "Jackass."

16. Nurse Kuch acted on her racial and ethnic bias against Dr. Jay through outright insubordination.  She refused to follow his orders, spread childish gossip about him to his peers and other staff members, manufactured false complaints about him,[4] and even tried to sabotage some of his cases – by changing his prescription orders, cancelling patient appointments, and refusing to treat his patients.

17. Nurse Kuch's bias against Dr. Jay stood so transparent that CEO Jeff Neuberger[5] met with her in early 2012 at the direction of Medical Director Dr. Robert Roswick to tell her that she should either make formal complaints about Dr. Jay or not say anything at all.  He said that it wasn't right for her

---

[2] Nurse Kuch also apparently harbored prejudice against Native Americans.  She openly complained that "they don't contribute anything to society" after treating a Native American patient with lung cancer.

[3] Dr. Jay typed his instructions for many patients including those with hearing loss to ensure no confusion.

[4] For example, Nurse Kuch grumbled to Clinic leadership that Dr. Jay allegedly didn't open the door for a patient on one occasion and that he had his back turned to a patient on another.

[5] Neuberger served as CEO until relieved by Lein in 2013.  Likewise, Dr. Robert Roswick acted as Medical Director until Dr. Tanous relieved him at the same time.

to make unsubstantiated comments about Dr. Jay without giving him an

opportunity to respond.  Neuberger said that, going forward, staff and

physicians must file incident reports to document complaints: "This will

help us sort through what is real and what is not real."

18. Dr. Roswick and Neuberger even took the extraordinary step of installing an

external manager, Rosemary Kuntz, in the Oncology Department to monitor

the situation and determine whether Nurse Kuch's complaints had merit.

Kuntz reported back that Dr. Jay did nothing out of the ordinary and Nurse

Kuch led the staff in picking on him.

19. Dr. Rao promptly removed Kuntz from her position as External Manager in

the Oncology Department promoted Kuch to Nurse Manager.  The elevated

position provided Kuch with more influence and a new platform to harass

Dr. Jay.  Kuntz's demotion also deprived Dr. Jay of an objective, third-party

perspective on Kuch's incessant complaints.

20. Nurse Kuch turned to filing frivolous incident reports against Dr. Jay.  She

and other staff members in her charge filed incident reports against him for

such trivial offences as spelling errors, while not documenting far more

serious transgressions by other physicians.  The Clinic didn't require

compliance with its normal procedure for incident reports when filing

reports against Dr. Jay – it allowed Nurse Kuch to file unsigned,

unwitnessed complaints into Dr. Jay's file without first giving him the opportunity to review and comment.

### *Dr. Jay reported Kuch's discriminatory conduct to the Clinic.*

21. In November 2012, Dr. Jay reported to Dr. Rao that Nurse Kuch called him "Ahmed the Terrorist." Dr. Rao did not investigate Dr. Jay's claim, question Nurse Kuch, or take other responsive action. Instead, he asked Dr. Jay why he was bothered by the comment, as Nurse Kuch is "just a woman."

22. Dr. Jay accepted shareholder status in June 2013. He looked forward to continuing to grow his practice and spending his career at the Clinic.

23. Despite the Clinic's previous order that Kuch either file formal complaints against Dr. Jay or stop spreading gossip, she continued to make unsubstantiated, informal complaints against him. The Clinic tolerated the informal complaints and divested Dr. Jay of any meaningful chance to response and determine "what is real and what is not real."

24. In July 2013, Dr. Jay met with Dr. Hamar to discuss Kuch's unsubstantiated complaints. Dr. Jay reported that Kuch held a racial bias against him, called him ethnic slurs, and made fun of his accent. He stated that it rose to the level of workplace harassment. Dr. Hamar took no action.

25. Dr. Jay followed up several months later with another report to Drs. Hamar and Tanous that Kuch called him racial slurs and made fun of his accent.

Neither Medical Director initiated an inquiry into Dr. Jay's report, spoke to Kuch regarding the allegations, or took any action whatsoever. Instead, Dr. Hamar told Dr. Jay that Manager Kuch was very valuable to the Clinic and "no one else can do her work."

26. Dr. Jay reported Kuch's racially discriminatory behavior and comments to Dr. Tanous several more times through the course of 2014. Dr. Jay reported that Kuch called him racial slurs, exaggerated his accent, and undermined him with peers, staff, and patients. Dr. Tanous did nothing to investigate or address Dr. Jay's repeated complaints.

27. Kuch's racial animus against Dr. Jay affected patient care. For example, in March 2014, Dr. Jay treated a cancer patient with chemotherapy and ordered her to come back the next day for a follow-up shot. Kuch – on her own accord and without consulting with Dr. Jay or any other physician – told the patient not to come in and explained that many patients misunderstand Dr. Jay because of his accent. Dr. Jay learned weeks later that his patient did not receive the shot he ordered and contracted a severe infection as a result. The infection necessitated skin grafting and antibiotics, and cut the patient's chemotherapy prematurely short. The patient passed away a few months later.

28. Dr. Jay immediately requested a meeting with Dr. Tanous to discuss the case.  He again complained that Nurse Manager Kuch held a racial bias against him, embellished his accent, and harassed him and his patients.  Dr. Jay made clear that Kuch's bias had grown into a more serious issue than ever before as it now may have caused a patient's death.  Dr. Tanous did not initiate an inquiry into Dr. Jay's allegations, speak to Kuch about the incident, or take any action at all.

### *Dr. Jay reported insurance/Medicare fraud concerns to the Clinic.*

29.  Dr. Jay also reported insurance and Medicare fraud concerns to the Clinic.  Specifically, he learned that Dr. Rao made a practice of billing for examining patients that he didn't actually examine.  That practice is illegal, unethical, and abusive – particularly as it relates to Medicare billing as most of Dr. Rao's patients were elderly and therefore the Clinic billed the United States government through Medicare for their examinations.

30. Dr. Jay first brought his concern in February 2013 directly to Dr. Rao.  He responded that insurance companies and the government have a lot of money so Dr. Jay shouldn't worry about it.

31. Dr. Jay next reported his concern several times, starting in July 2013, to Drs. Hamar and Tanous.  Dr. Jay told them that many of Dr. Rao's former patients told him that Dr. Rao didn't examine them.  Dr. Jay told them that

Dr. Rao's billing practices constituted fraud on both insurance companies and Medicare.  Neither Medical Director showed surprise or unease at Dr. Jay's reports.

32.  A patient substantiated Dr. Jay's reports in November 2013 by filing an official complaint against Dr. Rao for failing to examine him.  A quick review of the chart documented that Dr. Rao billed for an exam that he didn't do.

33.  The patient's complaint forced Dr. Hamar to admit that Dr. Rao's conduct constituted fraud on both insurance companies and Medicare – the Clinic couldn't tolerate the exposure.  He organized a meeting with Drs. Jay and Rao to discuss next steps.  Dr. Hamar also sent Dr. Rao a letter in early 2014 documenting Dr. Jay's concerns and the patient's complaint.

34. Dr. Rao told Dr. Jay that he was upset about Dr. Jay's complaint and that Dr. Hamar sent him a letter documenting it.

### *The Clinic retaliated against Dr. Jay for his complaints.*

35. Shortly thereafter, on February 6, 2014, Dr. Rao's frustration with Dr. Jay boiled over into a heated disagreement.  Dr. Rao thought that Dr. Jay requested to use a patient exam room that already had one of Dr. Rao's patients in it.  When Dr. Jay tried to explain that he hadn't made the request, Dr. Rao became angry and accused Dr. Jay of lying.  In an aggressive tone,

he said that Dr. Jay constantly made complaints about him to "higher up." Recognizing that patients were within earshot, Dr. Jay tried to walk away. But Dr. Rao followed him into another exam room and continued berating him, only stopping when he realized a patient was listening.  Dr. Jay tried to save the interaction by pretending to introduce Dr. Rao to the patient.

36.   Dr. Hamar and Chief of Human Resources Mark Dordahl then approached Dr. Jay in his office and told him that he behaved in a rude and unprofessional manner.  Given that he had done nothing but try to diffuse Dr. Rao's anger, Dr. Jay was stunned.  He offered to get his nurse to explain what happened as she witnessed the interaction.  Dr. Hamar blocked the exit and pushed Dr. Jay with his finger: "I don't want to listen to you.  I've had enough of this.  You'll hear from me."

37. The Clinic's leaders chose to blame the incident on Dr. Jay without investigation because they were still upset at his – accurate – report of Dr. Rao's insurance and Medicare fraud.  They had also grown tired of hearing his reports of Kuch's discriminatory comments and conduct.  The Medical Directors did not want to even listen to Dr. Jay's version of events or interview witnesses that could verify what actually happened.  The Clinic just wanted to rid itself of Dr. Jay, but it didn't have a legitimate and non-retaliatory reason.

38. Dr. Hamar and Dordahl met with Dr. Jay a week later and told him that they wanted to "assist and facilitate an improvement in the situation . . . to allow him to succeed in his practice at Mid Dakota rather than to punish or try and remove him from practice." They represented that "the goal here is to help fix the issues and not lose him as a physician." They then asked him to attend the Vanderbilt University Medical Center Comprehensive Assessment Program in Nashville, Tennessee for "an evaluation of his mental, physical, and social well-being."

39. Dr. Jay agreed and told him that he'd take care of it before the end of the month. Though Dr. Rao was involved in the same February 6 incident, the Clinic did not request that he seek a similar evaluation.

### *Dr. Jay participated in good-faith with the Clinic's new requirements on him while the Clinic plotted his termination.*

40. Dr. Jay attended the Vanderbilt evaluation from February 26-28 as he promised. The evaluation concluded that Dr. Jay "acknowledged the need to make some changes, accepted responsibility for these changes, and has a positive attitude towards the possibility of change." The evaluator recommended that Dr. Jay complete a brief follow-up intensive treatment at Acumen Institute in Lawrence, Kansas.

41. Drs. Hamar and Tanous met with Dr. Jay on April 10 to discuss the Vanderbilt evaluation. They asked Dr. Jay to attend the Acumen Institute

for additional evaluation.  Dr. Jay agreed and the Clinic set an on-site, 3-week course for Dr. Jay at Acumen beginning at the end of October.

42. Later that month, Dr. Jay reported to Dr. Tanous that Dr. Rao continued to bill for examining patients that he hadn't actually examined.  Dr. Jay reminded Dr. Tanous that the practice exposed the Clinic to False Claims Act actions.

43. Dr. Jay continued providing exceptional care to his patients over the next several months.  At the Clinic's request, he participated in a 3-day individual coaching session at Acumen in July.

44. Contrary to the Clinic's stated intentions to Dr. Jay for the evaluation and treatment courses, it actually wanted to terminate his employment.  The Clinic hoped that either Vanderbilt or Acumen would provide third-party medical justification for termination.   The Clinic additionally requested that its physicians and staff manufacture and document purported reasons justifying Dr. Jay's termination.

45.  In September 2014, Dr. Rao accused Dr. Jay of falsifying his medical credentials by listing "Hematology and Oncology" on his biography instead of just "Oncology."  But Dr. Jay quickly resolved the issue by forwarding an email communication from the Clinic's Marketing/Communications

Specialist, who explained that Dr. Rao in fact requested that she use that terminology to describe Dr. Jay.

46. Dr. Jay again complained to Dr. Tanous about workplace harassment and retaliation.  Though Dr. Tanous told his partner that he'd get back to him within 2 days, he never did.

47.  Nurse Rebecca Bush sent a routine email in September to Dr. Jay asking him to modify the way that he wrote on "Oncology – Return to clinic" slips. He responded "will do."  Bush tellingly sent the mundane exchange to Dordahl "for the record."

48. From October 27 through November 14, Dr. Jay participated in Phase I of the Acumen Institute Longitudinal Day Treatment, Coaching, and Education program.[6]  Dr. Peter Graham served as the leader of his treatment team.  The Clinic misled Dr. Jay into believing that its request for his participation at Acumen was founded in a good-faith desire to improve his practice.  In fact, the Board sought to use Dr. Jay's absence to fabricate reasons for termination of his employment.

49. When Dr. Jay traveled to Kansas for his Acumen evaluation, Dr. Tanous instructed Pam Crawford, the Clinic's Compliance Officer, to meet with Oncology Department staff members and solicit complaints about Dr. Jay.

---

[6] The Clinic required Dr. Jay to complete an FMLA request for leave due to a serious health condition.

Crawford drafted a memo that concluded that staff didn't like Dr. Jay and therefore the Clinic should find "resolution, which may consist of legal and confidential communications."

### *Acumen concluded that Dr. Jay was perfectly fit to practice medicine.*

50.  Dr. Tanous attempted to influence Acumen into backing the Clinic's position that Dr. Jay could not safely practice medicine and shouldn't be allowed back to work by sending Crawford's memo to Dr. Graham during Dr. Jay's evaluation.  Dr. Tanous betrayed that the Clinic decided to terminate Dr. Jay prior to even sending him to Acumen by asking Dr. Graham whether Dr. Jay had hired an attorney.

51.  Dr. Graham wondered "how one could come to the conclusions that the memo outlines when [Dr. Jay] has not been interviewed by the writer of the memo."[7]  He documented that:

- Dr. Jay participated in the entire process in very good-faith to address the Clinic's concerns;

- He observed no resistance to change in Dr. Jay;

- He observed no evidence of a thought disorder;

- Dr. Jay's judgement is good;

---

[7] Dr. Graham wrote to Dr. Tanous that "the letter strikes me as problematic in several ways legally and professionally and I think that you and I need to discuss this situation carefully."  Dr. Tanous chose not to speak with Dr. Graham about the evaluation, treatment, or recommendations that the Clinic originally requested.

- Dr. Jay actively engaged in the educational and individual change process and welcomed feedback;

- Dr. Jay is not paranoid about workplace issues; and

- Dr. Jay preferred using the electronic system for medical notes and gave electronic order delegation to all nurses.

52.  Dr. Graham wrote a letter to Dr. Tanous on November 21 summarizing his findings and recommendations; he provided his full report on January 22, 2015.  Dr. Graham wrote that Dr. Jay "successfully completed the first phase immersion of three weeks"; "participated in the whole process in very good faith"; and "made a shift in his perspective and understanding."  Dr. Graham recommended that the Clinic facilitate meetings between Dr. Jay and both Clinic leaders and staff so that Dr. Jay can "make his current attitude, approach, and intentions clear to everyone, so that they know he is quite serious about changing his work presence and style of communication for the better over the next year's process and beyond."  Dr. Graham also requested a conversation with Lein and Dorsdahl to discuss Dr. Jay's return to work.

***The Clinic executed its retaliatory termination in spite of Acumen's findings.***

53. The Clinic never intended on following Acumen's recommendations – the entire reason it sent Dr. Jay to Acumen was to gain a pretextual basis for termination.  Given that Dr. Graham didn't provide one and in fact opined

16

that Dr. Jay was fit for practice and open to change, the Clinic chose to disregard Dr. Graham's findings altogether and plow forward with its plan to terminate Dr. Jay's employment.

54. Dr. Jay returned to work on November 17.  The next day, Dr. Tanous gave him a copy of Crawford's memo.  Dr. Tanous said that the Clinic's Complaints Officer "*received* these complaints from the nursing department around November 4."  Dr. Tanous represented to his partner that he'd come back the next day to get feedback from him on the complaints and he'd also set a reconciliatory meeting with Dr. Jay and the oncology staff for November 21 "to improve dialog with all nurses and improve communication."

55. Dr. Jay responded that he would attend the November 21 meeting and looked forward to seeing Dr. Tanous the next day to provide his perspective on Crawford's memo.  Dr. Tanous didn't set the reconciliatory meeting and never had any intention of doing so.

56. Dr. Tanous did not come back to see Dr. Jay and get his feedback on November 18, 19, or 20.  So, on November 20, Dr. Jay took the initiative and sent a brief email to Dr. Tanous to tell him that the memo's allegations were not true.

57.  Dr. Jay finished with his last patient on November 21 and expected to proceed to the Oncology Department reconciliatory meeting that Dr. Tanous promised.  Instead, Dr. Tanous confronted Dr. Jay outside his office and walked him to the Administrative Room, where Lein was waiting.  Dr. Tanous told Dr. Jay that he hadn't scheduled any reconciliatory meeting.  Instead, Dr. Tanous handed Dr. Jay a letter suspending his employment "pending further investigation."

### *The Clinic made false representations to Dr. Jay directly contradicted by its By-Laws.*

58.  Lein asked Dr. Tanous to excuse himself.  Lein then told Dr. Jay that the Clinic would not conduct an investigation as stated in its letter.  He told Dr. Jay that the Board planned to move for his termination, and even if he survived the termination vote by the shareholders, the Clinic still wouldn't allow him to return to work.[8]  Dr. Jay protested that he'd been the target of racial harassment and the Clinic had not taken any action despite his complaints.  Lein answered that the Clinic obtained damaging information about Dr. Jay from his former clinic and told him that he'd lose his medical license if he allowed the matter to proceed without resigning.

---

[8] In fact, the Clinic's By-Laws vested termination authority with its shareholders.  No provision allows the Clinic to disallow a physician who shareholders choose not to terminate from returning to work.

59.  Though the letter purported to only suspend Dr. Jay, Lein instructed him to vacate his office and return his pager.  The Clinic delivered additional personal belongings to his home. The Clinic hired Dr. Jay's replacement – a white physician – 20 days later.[9]

60.  The Clinic moved ahead with termination proceedings.  It sent Dr. Jay a letter on January 6, 2015 announcing a special meeting of all shareholders on January 26 to terminate his employment:

> Upon completion of our investigation, we continue to have concerns about your ability to practice in the Clinic environment, including working cooperatively and communicating effectively with others . . . Finally, there is significant concern regarding your credentials and actions in treating hematology patients.

61. In fact, as promised by Lein, the Clinic did not conduct an investigation – indeed, it didn't even interview Dr. Jay, the subject of the alleged complaints spontaneously "received by" Crawford on November 4, 2014.  The Clinic's assertions regarding Dr. Jay's "ability practice in the Clinic environment" stood directly contradicted by the Acumen report and recommendations that it commissioned.  Finally, the Clinic's purported concerns regarding Dr. Jay's hematology credentials were resolved 6 months earlier by its own marketing director, who concluded that Dr. Rao insisted that Dr. Jay's

---

[9] On information and belief, the Clinic started its search for Dr. Jay's replacement while he participated in the Acumen treatment it recommended.

biography bear those credentials.[10]  In short, the Clinic's stated reasons for

termination stood demonstrably false and pretextual.

62.   The Clinic's former Medical Director, Dr. Roswick, quickly recognized the

disparate treatment.  He stated that the Clinic would not treat a "white

American born doctor" the same way it dealt with Dr. Jay.  He knew from

experience that several white physicians at the Clinic had more complaints

with far more serious allegations leveled against them but were allowed to

continue practice without suspension or termination.[11]

### *The Clinic knowingly presented false reasons to shareholders in support of termination.*

63.   The Board convened the special meeting of shareholders on January 26.

Board members presented demonstrably false reasons to shareholders in

support of the recommendation to terminate their partner.  They told

shareholders that:

---

[10] In fact, several of the Clinic's white physicians advertised themselves as "Board-certified" despite having no such credentials, including Dr. Tanous himself.  The Clinic took no action against them.

[11] The Clinic previously one of its white physicians with interpersonal communication issues to outside evaluation and training.  The physician returned with a list of recommendations from his evaluator and the Clinic worked to implement the recommendations so that the physician could successfully practice medicine.  In contrast to Dr. Jay, the Clinic did not seek grievances from staff members during the physician's absence, suspend the physician upon return, refuse to implement recommendations, or terminate the physician.  The Clinic allowed another white physician who failed her Board exam to continue practicing for years – without discipline, suspension, or even monitoring – despite multiple sustained formal complaints and adverse outcomes in patient care.  The Clinic tried for over a year to work within the treatment plan of another one of its white physicians who repeatedly solicited sex from patients and their family members.

- Dr. Jay falsely represented himself as Board-certified in hematology;

- Patients didn't like Dr. Jay and didn't understand him;

- Dr. Jay committed frequent medical errors on his patients that resulted in adverse patient outcomes;

- Dr. Jay caused problems at the Clinic from "Day 1";

- Dr. Jay refused to see a hematology patient;

- Dr. Jay refused to use the electronic records system to order medication;

- Dr. Jay has a psychiatric illness;

- Dr. Jay has paranoia; and

- Dr. Jay loses many Clinic patients to competition.

64. In fact, as the Board knew, particularly given that it had already received

Dr. Graham's summarized findings and detailed report:

- Dr. Rao instructed the Clinic's Marketing Director to represent Dr. Jay as certified in hematology;

- The vast majority of Dr. Jay's patients understood him and liked him very much and he received fewer patient complaints than other similarly situated physicians – in fact his patients often wrote highly commending letters about his skill, bedside manner, and outcomes;

- Dr. Jay committed far fewer errors on patients than similarly situated physicians at the Clinic[12];

- Dr. Jay received accolades from staff and patients alike "from Day 1";

---

[12] In fact, at least one white surgeon at the Clinic failed when performing AV fistula procedures at such a high rate that the unit simply stopped sending procedures to the Clinic.  The Clinic did nothing to address the incompetence.

- The hematology patient in question in fact skipped her scheduled appointments and was non-compliant[13];

- Dr. Jay preferred to use the electronic system and delegated that authority to all of his nurses;

- Dr. Jay did not have a psychiatric illness and the Acumen team "saw no psychiatric reason why he shouldn't be in the workplace";

- Dr. Jay did not have paranoia; and

- Dr. Jay lost far less patients to competitors than many similarly situated physicians at the Clinic.

65.  Dr. Tanous told shareholders that he would not implement Dr. Graham's recommendations.  A former Board member protested that the Clinic had required Dr. Jay to participate in the evaluation and treatment and therefore the Clinic should at least abide by the recommendations.

66.  The Board called for a vote on Dr. Jay's termination and distributed ballots to present shareholders.  Dr. Seifert had previously secured proxy votes from absent shareholders to ensure passage of the Board's recommendation for termination.

---

[13] Other physicians at the Clinic refused to see patients for far less serious reasons.  For example, one of the Clinic's white physicians refused to see a patient who came 15 minutes late to his scheduled appointment.  Though the patient later died, the Clinic successfully dismissed the family's complaint by relying on the fact that the patient was late.

67.  Facing certain termination in moments and subsequent collateral consequences including possible loss of his medical license, Dr. Jay resigned his position and surrendered his shareholder status.

68.  The Clinic subsequently terminated Dr. Roswick because of his complaint identifying racial discrimination in Dr. Jay's suspension and termination – it labeled him a "disruptive physician."  At the special meeting to terminate Dr. Roswick, a Board member stated that his email charging the Clinic with discriminatory practices put the Clinic at risk and "that is why we are here."[14]  Another physician asked the Board whether "it wasn't until he sent the email about discrimination that you guys felt he needed to be fired."  Dr. Seifert answered with an unequivocal "yes."

### *The Clinic shifted its purported reasons for termination.*

69.  Dr. Jay filed an EEOC claim in July 2015.  In its response, the Clinic shifted its stated reasons for suspension and termination: it now claimed that it suspended him "because of his continued inappropriate interactions and refusal to meet with the oncology staff at the request of the Medical Director."  In fact, the Clinic suspended Dr. Jay within 5 days of his return from Acumen – no "continued inappropriate interactions" existed.

---

[14] Dr. Starr, another physician at the Clinic, pointed out that Dr. Roswick had done nothing wrong by identifying discriminatory treatment of Dr. Jay.  Dr. Starr resigned from the Clinic shortly thereafter.  Another physician commented that she couldn't pass a single day of work without hearing 1-5 racially insensitive comments at the Clinic.

Moreover, Dr. Jay enthusiastically agreed to meet with oncology staff; the Medical Director and Lein decided to not schedule or allow the meeting.

## COUNT 1: TITLE VII RACE AND NATIONAL ORIGIN DISCRIMINATION[15] (ALL DEFENDANTS)

70.  Dr. Jay endured a hostile work environment due to his race and national origin.  He repeatedly complained to the Clinic, the Board, and individual defendants about the hostile and discriminatory work environment.

71.  Defendants failed to investigate Dr. Jay's complaints or take corrective action.  Instead, they allowed the discriminatory conduct against Dr. Jay to continue – and escalate.

72.  Dr. Jay was ultimately forced to resign and was constructively discharged due to the ongoing hostile and discriminatory work environment.

73.  Moreover, Dr. Jay's race and national origin were motivating factors in his suspension and constructive discharge.  If Dr. Jay was a "white American born doctor," Defendants would not have:

- Manufactured reasons for his suspension and termination;

- Sent him to Vanderbilt's evaluation and treatment under false pretenses;

- Sent him to Acumen's evaluation and treatment under false pretenses;

- Used his absence to request that staff contrive complaints for use in papering a record for termination;

---

[15] See generally 42 U.S.C. § 2000(e) et seq.

- Failed to conduct an actual and good-faith investigation regarding the contrived complaints;

- Suspended him based on contrived complaints that it did not investigate;

- Gathered proxy votes from shareholders in support of termination;

- Presented demonstrably false reasons in support of termination to shareholders;

- Threatened him and made false representations to him regarding the consequences of failing to resign;

- Threatened him and made false representations to him regarding what would happen if he survived the shareholder termination vote;

- Refused to consider and implement the Acumen evaluation and recommendations; and

- Taken other actions in support of Dr. Jay's suspension, termination, and constructive discharge.

74. Defendants replaced Dr. Jay with a lesser qualified "white American born doctor."

75. Dr. Jay suffered damages due to Defendants' discrimination, including: lost wages and benefits, front pay, emotional distress, attorney fees, and costs.

**COUNT 2: TITLE VII RETALIATION (ALL DEFENDANTS)**

76. Dr. Jay engaged in statutorily protected activity when he complained to Defendants about the hostile and discriminatory work environment, including the racial epithets and xenophobic comments against him.

77.  Defendants took adverse employment actions against Dr. Jay because of his

protected activity.  But for Dr. Jay's statutorily protected activity,

Defendants would not have:

- Manufactured reasons for his suspension and termination;

- Sent him to Vanderbilt's evaluation and treatment under false pretenses;

- Sent him to Acumen's evaluation and treatment under false pretenses;

- Used his absence to request that staff contrive complaints for use in papering a record for termination;

- Failed to conduct an actual and good-faith investigation regarding the contrived complaints;

- Suspended him based on contrived complaints that it did not investigate;

- Gathered proxy votes from shareholders in support of termination;

- Presented demonstrably false reasons in support of termination to shareholders;

- Threatened him and made false representations to him regarding the consequences of failing to resign;

- Threatened him and made false representations to him regarding what would happen if he survived the shareholder termination vote;

- Refused to consider and implement the Acumen evaluation and recommendations; and

- Taken other actions in support of Dr. Jay's suspension, termination, and constructive discharge.

78. Dr. Jay suffered damages due to Defendants' retaliation, including: lost wages and benefits, front pay, emotional distress, attorney fees, and costs.

## COUNT 3:  ADA DISABILITY DISCRIMINATION[16] (ALL DEFENDANTS)

79.  At all times, Dr. Jay was qualified to perform his duties as an Oncologist. He did not suffer from any mental impairment or disability.

80.  Defendants regarded Dr. Jay as having an undisclosed psychiatric illness and paranoia.  They sent him to two separate evaluations – Vanderbilt and Acumen – with the hope that a third-party could confirm their belief. Neither Vanderbilt nor Acumen provided confirmation; in fact, both evaluators said that Dr. Jay did not suffer from any psychiatric illness or paranoia.

81.  Despite medical documentation unequivocally stating that Dr. Jay did not suffer from psychiatric illness or paranoia, Defendants continued to regard Dr. Jay as disabled with a psychological illness or paranoia.  They confirmed their belief by stating to shareholders at the special meeting to terminate Dr. Jay that Dr. Jay had a psychological illness and paranoia as reasons in support of termination.

82.  Defendants held prejudice against psychological illness and paranoia. Therefore, they refused to consider or adopt the very reasonable

---

[16] See generally 42 U.S.C. § 12101 et seq.

accommodations suggested by Acumen, including simply organizing a meeting with Dr. Jay and Oncology staff.

83. Instead, based on their prejudice against someone they incorrectly regarded as having mental health issues, they suspended Dr. Jay's employment and constructively discharged him.  But for Defendants' incorrect perception regarding Dr. Jay's disability status, they would not have:

- Manufactured reasons for his suspension and termination;

- Sent him to Vanderbilt's evaluation and treatment under false pretenses;

- Sent him to Acumen's evaluation and treatment under false pretenses;

- Used his absence to request that staff contrive complaints for use in papering a record for termination;

- Failed to conduct an actual and good-faith investigation regarding the contrived complaints;

- Suspended him based on contrived complaints that it did not investigate;

- Gathered proxy votes from shareholders in support of termination;

- Presented demonstrably false reasons in support of termination to shareholders;

- Threatened him and made false representations to him regarding the consequences of failing to resign;

- Threatened him and made false representations to him regarding what would happen if he survived the shareholder termination vote;

- Refused to consider and implement the Acumen evaluation and recommendations; and

- Taken other actions in support of Dr. Jay's suspension, termination, and constructive discharge.

84. Dr. Jay suffered damages due to Defendants' discrimination, including: lost wages and benefits, front pay, emotional distress, attorney fees, and costs.

## COUNT 4:  FALSE CLAIMS ACT[17] RETALIATION (ALL DEFENDANTS)

85. Dr. Jay engaged in protected activity by reporting on multiple occasions to Drs. Rao, Hamar, and Tanous that Dr. Rao fraudulently billed insurance companies and Medicare for examinations of patients that he didn't actually examine. Dr. Jay had a good-faith belief that Dr. Rao was committing fraud against the United States government; a reasonable employee in similar circumstances would have believed the same thing.

86. Dr. Jay's made his reports in furtherance of efforts to stop the fraudulent billing.

87. Defendants knew that Dr. Jay engaged in protected activity because he made his reports directly to them.  On information and belief, Drs. Rao, Hamar, and Tanous informed other Board members regarding Dr. Jay's reports.

88. Defendants retaliated against Dr. Jay.  Specifically, were it not for Dr. Jay's protected activity, Defendants would not have:

---

[17] See generally 31 U.S.C. § 3730 (h).

- Manufactured reasons for his suspension and termination;

- Sent him to Vanderbilt's evaluation and treatment under false pretenses;

- Sent him to Acumen's evaluation and treatment under false pretenses;

- Used his absence to request that staff contrive complaints for use in papering a record for termination;

- Failed to conduct an actual and good-faith investigation regarding the contrived complaints;

- Suspended him based on contrived complaints that it did not investigate;

- Gathered proxy votes from shareholders in support of termination;

- Presented demonstrably false reasons in support of termination to shareholders;

- Threatened him and made false representations to him regarding the consequences of failing to resign;

- Threatened him and made false representations to him regarding what would happen if he survived the shareholder termination vote;

- Refused to consider and implement the Acumen evaluation and recommendations; and

- Taken other actions in support of Dr. Jay's suspension, termination, and constructive discharge.

89. Defendants' retaliation against Dr. Jay was motivated solely by his

protected activity.[18]

---

[18] Dr. Jay pleads this count in the alternative to Counts 1-3.

90.  Dr. Jay suffered damages due to Defendants' retaliation, including: lost

wages and benefits, front pay, emotional distress, attorney fees, and costs.

## COUNT 5: BREACH OF FIDUCIARY DUTY[19] (ALL DEFENDANTS)

91.  North Dakota law required Defendants to act in an honest, fair, and

reasonable manner toward Dr. Jay in his capacity as a Clinic shareholder,

while always acting in the utmost good-faith and with loyalty to him as a

shareholder.  Defendants did not meet these high fiduciary standards.

92.  Instead, they acted out of avarice, expediency, or self-interest in suspending

and constructively discharging Dr. Jay.  In doing so, they acted in a

fraudulent, oppressive, and unfairly prejudicial manner toward Dr. Jay and

frustrated his reasonable expectations as a shareholder.  Specifically,

Defendants:

- Manufactured reasons for his suspension and termination;

- Sent him to Vanderbilt's evaluation and treatment under false pretenses;

- Sent him to Acumen's evaluation and treatment under false pretenses;

- Used his absence to request that staff contrive complaints for use in
  papering a record for termination;

- Failed to conduct an actual and good-faith investigation regarding the
  contrived complaints;

- Suspended him based on contrived complaints that it did not investigate;

---

[19] See generally N.D.C.C. §§ 10-19.1; 10-19.1-115.

- Gathered proxy votes from shareholders in support of termination;

- Presented demonstrably false reasons in support of termination to shareholders;

- Threatened him and made false representations to him regarding the consequences of failing to resign;

- Threatened him and made false representations to him regarding what would happen if he survived the shareholder termination vote;

- Refused to consider and implement the Acumen evaluation and recommendations; and

- Took other actions in support of Dr. Jay's suspension, termination, and constructive discharge.

93. Defendants' behavior failed to meet both their substantive fiduciary obligations of honesty, good-faith, loyalty, fairness, and reasonableness as well as their procedural fiduciary obligations to avoid unfair and oppressive negotiating tactics.

94. Dr. Jay had a reasonable expectation of continuing employment, and that his employment would not be terminated based on knowingly and demonstrably false reasons set forth by Defendants. He had a reasonable expectation of procedural protections for his employment, including that Defendants would present only truthful reasons for termination to shareholders or no reasons at all – but not false reasons – so that

shareholders could make an informed decision regarding whether to terminate his employment.

95. Dr. Jay's employment at the Clinic served as his principal source of income. He planned on spending the entirety of his career at the Clinic. Defendants' breach of their fiduciary duties caused him damages, including lost wages, front pay, deprivation of the appreciation value of his Clinic shares, consequential damages, attorney fees, and costs.[20]

## PRAYER FOR RELIEF

WHEREFORE, Dr. Jay requests that the Court:

- Find and declare that Defendants violated Title VII's prohibitions on race and national origin discrimination and retaliation as described above;

- Find and declare that Defendants violated the ADA's prohibition on disability discrimination as described above;

- Find and declare that Defendants violated the FCA's prohibition on retaliation as described above;

- Find and declare that Defendants breached their fiduciary duties to Dr. Jay as described above;

- Award Dr. Jay compensatory damages, including back pay, front pay, emotional distress, consequential damages, and loss of share appreciation damages;

- Award Dr. Jay punitive damages;

---

[20] See generally Balvik v. Sylvester, 411 N.W.2d 383, 388-9 (N.D. 1987) (suggesting alternative remedies to forced dissolution).

- Award Dr. Jay special damages, including litigation costs and reasonable attorneys' fees;

- Order injunctive relief, including reinstatement;

- Enjoin Defendants from further violations of Title VII, ADA, and FCA;

- Order dissolution of the Clinic and liquidation of its assets;

- Order the payment of interest as allowed by law; and

- Award such other and further relief as the Court deems equitable and just.

**Dr. Jay requests trial by jury**.


Dated: July 7, 2016                        **MADIA LAW LLC**



                                           /s/Joshua A. Newville_____
                                           Joshua A. Newville, Admitted to D. N.D.
                                           J. Ashwin Madia*, MN No. 0321187
                                           345 Union Plaza
                                           333 Washington Avenue North
                                           Minneapolis, MN 55401
                                           Telephone: 612.349.2743
                                           Fax: 612.235.3357
                                           Email: joshuanewville@madialaw.com
                                           **ATTORNEY FOR PLAINTIFFS**

                                           *pro hac vice application forthcoming